ADAM OGILVIE AND OTHERS, APPELLANTS, *v.* THE KNOX INSURANCE COMPANY, LEVI SPARKS, AND OTHERS.

In a bill by judgment creditors against an incorporated insurance company and its stockholders, to compel the latter to pay up the balance due on their several subscriptions to the stock, they cannot be allowed to defend themselves by an allegation that their subscriptions were obtained by fraud and misrepresentation of the agent of the company.

It is too late, after the investment is found to be unprofitable, and debts are incurred, for stockholders to withdraw their subscriptions, under such a pretence or plea.

It is not a sufficient objection to the bill, for want of proper parties, that all the creditors or stockholders are not sued. If necessary, the court may, at the suggestion of either party that the corporation is insolvent, administer its assets by a receiver, and thus collect all the subscriptions or debts to the corporation.

THIS was an appeal from the Circuit Court of the United States for the district of Indiana.

It was a bill filed on the equity side of the court, by Ogilvie, Angle, & Co., traders in partnership in Iowa, together with twelve other persons, citizens of Missouri, Ohio, and Michigan, against the Knox Insurance Company, and against Levi Sparks and thirty-six other persons, subscribers to the capital stock of the company. Being a creditor's bill, filed by the complainants and such other creditors as might make themselves parties, thirty-two other creditors came in and made themselves parties to the suit. The bill alleged that the complainants had recovered divers judgments against the insurance company, upon which executions had issued, the return

*Ogilvie et al. v. Knox Insurance Co. et al.*

to which had been, "no property;" that the other defendants severally subscribed for stock in the company, and were still indebted for it, payment not having been enforced by the company. The prayer of the bill was, that they might be decreed to pay their subscriptions, and that the judgments might be satisfied from the fund thus produced.

At the September rules, 1852, the bill was taken *pro confesso* against all the defendants; but afterwards they all (except the company) appeared, demurred, and, upon the demurrer being overruled, answered. The securities, being the subscription notes, were brought into court. Collum's answer was adopted by most of the other defendants, which answer is particularly noticed in the opinion of this court. After sundry other proceedings, not necessary to be mentioned, the court dismissed the bill, and the complainants appealed to this court.

It was argued by *Mr. Gillet* for the appellants, upon which side there was also a brief filed by *Mr. Judah,* and submitted on a printed argument by *Mr. Crawford* for the appellees.

The points made by the counsel for the appellants were, of course, similar in substance. The following were the fourth and fifth points of *Mr. Gillet,* and the third and fourth of *Mr. Judah:*

*Mr. Gillet:*

IV. The subscriptions and obligations of the defendants are not void, or voidable, even if it shall be admitted that the facts set up in their answers are true.

The defendants do not aver that the company authorized the false representations complained of, or that they approved of them after they were made. Nor do they aver that they repudiated the transaction as soon as they learned the true state of things. Nor do they state that they offered to restore things to their original condition. They set up that, on the 25th of June, 1851, more than a year afterwards, they would have nothing more to do with the company, nor would they pay their notes or bills. This was about a year after they

*Ogilvie et al. v. Knox Insurance Co. et al.*

knew of the heavy losses. In order to defeat their liability, they must connect the company with the fraud alleged. This they have wholly failed to do, both in their answers and evidence. An unauthorized falsehood, told by their agent, was no act of theirs, and they cannot be held responsible for it.

If Carnan misrepresented the condition and affairs of the company, that was a matter between him and those who subscribed on the strength of the representation. It was he, and not the company, that deceived them. The answers do not set up a legal defence to the defendant's obligations. They do not even aver that they offered to restore things to their original condition. They do not allege that they returned, or offered to return, the stock to be cancelled. Nor do they state that they asked the company to do anything at all. They kept the consideration of their obligations, and at the same time repudiated them, not because the company had deceived them, but because Carnan told them two falsehoods, as they aver. As they have presented their case by their pleadings, the defendants have no defence to their obligations.

"It (a corporation) is not, however, responsible for unauthorized or unlawful acts, even of its officers, though done *colore officii*. To fix the liability, it must either appear that the officers were expressly authorized to do the act, or that it was done bona fide, in pursuance of a general authority in relation to the subject of it, or that the act was adopted or ratified by the corporation."

Angel and Ames, pp. 250, 251.

In Thayer *v.* Boston, (19 Pick., 516, 517,) Chief Justice Shaw used the same language.

The answers in the present case do not aver what is here required to be proved, to make the corporation liable for any supposed wrong on the part of Carnan.

V. The fact that from May, when the true amount of the Vincennes stock must have been known by the Jeffersonville stockholders, to the middle of August, no complaint was made on that account, is conclusive evidence that the defendants did not consider themselves injured by that fact.

The evidence is explicit and clear, that in April, 1850, Ryan

made out a statement, truly showing the condition of the company, and that it had some $25,000 or $26,000 of surplus on hand, and of course showed that there was no $40,000 of Eastern exchange. It also showed the amount of stock, because it was the same statement shown to Savitz and Hughs in August, and Savitz swears that he then noticed that the whole stock of the company amounted to only $97,000. Now, it appears that Carnan took this statement to Jeffersonville in May, 1850, and there showed it. He states that he never showed any other statement to them there; the stockholders then knew that $75,000 had not been subscribed at Vincennes. He swears he told them that he was sorry that they had taken $67,000, because it was a good deal more than had been taken at Vincennes, and he proposed to go and increase the stock at the latter place. But the Jeffersonville subscribers objected, because they wanted the smallest possible amount of stock to spread the anticipated dividend over. They then knew the facts as well as they ever did, and did not object, as they would have done, if they had thought themselves injured by the smallness of the Vincennes subscription. Not even a hint of complaint escaped the Jeffersonville subscribers until the middle of August, and then no formal objection made, nor for a very long time. They would not have been thus silent, if they had been really wronged.

*Mr. Judah:*

III. But further, admitting the charge of fraud to be proven, and that defendants relied on the representations, the defendants cannot protect themselves by it. It is too late.

When a party has the right to rescind, repudiate, on the ground of fraud, " he must do so at once, on discovering the fraud."

2 Parsons Cont., 278.

At the earliest moment after he has knowledge of the fraud.

Masson *v.* Burt, 1 Denio, 69.

2 Parsons Cont, 278, note S.

Any delay is a waiver, and mere lapse of time may be conclusive.

2 Parsons Cont., 279.

The party must act promptly, and rescind in toto.

Wheaton *v.* Baker, 14 Bart., 594.

Mann *v.* Worral, 16 Bart., 221.

But these men had the statement, called paper **Z**, on 4th May, 1850, and yet, up to the 4th June, increased their subscriptions $10,500, as appears by the dates of the securities, bill, and answers; and these men had the report of their committee, and the statement called W, in August or September, 1850—full knowledge of all the facts. And yet, between the 28th of September and 4th of October, these men, and amongst them Cullom, on his own stock, renewed their securities on 225 shares and $22,500. This whole defence is an afterthought.

IV. If these defendants might set up this fraud against the company, or their co-stockholders, they cannot set it up against the creditors of the company.

Suppose A, by fraud, induces B to become his partner in the firm of A & Co.; that A, in the name of A & Co., purchases goods for the firm on credit, and that, before payment is made, or even due, B discovers the fraud, and immediately rescinds for the sufficient fraud, what will be the effect on the sellers of the goods, creditors of the firm?

In such case, who will suffer? Nay, who should suffer? The rule is, that when one of two innocent parties must suffer by the fraud of a third party, he of the two who afforded the means, or gave the credit, must bear the loss.

Story on Agency, sec. 127, pp. 142, 143, and note 1.

Story's Eq. Jur., secs. 384, 385, 386, 387, 388.

Hiorns *v.* Holtom, 13 Eng. L. and E., 596.

So long as a man is a partner or a stockholder, however innocently, as relates to third and also innocent parties, he should suffer the consequences.

These men represented two-thirds of the capital; they had their names in the firm as stockholders, directors, officers.

Only some of the arguments of the counsel for the appellees can be given, and those are selected which are replies to the arguments upon the other side.

The plaintiffs have objected, that if Carnan did practice this fraud upon the defendants, it was his own wrong only; the insurance company did not authorize it, nor ought she to be affected by it. It is true she had the alternative to reject or adopt the unauthorized acts of her agent. If she had rejected them, there would have been no contract between her and the defendants. But she chose to adopt them, and therefore she took them tainted as they were.

> Chit. Con., 679; 2 Par. Con., 276, and n. (a); 1 Story Eq. Jur., sec. 256.
>
> Doggett *v.* Emerson, 3 Story, 735.
>
> Atwood *v.* Small, 6 Cl. and Fin., 448.
>
> Mason *v.* Crosby, 1 Woodb. and M., 342.
>
> Jeffrey *v.* Bigelow, 13 Wend., 518.
>
> Swatara R. R. Co. *v.* Brune, 6 Gill, 41.
>
> Crump *v.* U. S. Mining Co., 7 Gratt., 352.

But the plaintiffs contend, that if the fraud has been ever so strongly proved, and it has not been waived, and might be a good defence in a suit brought by the insurance company, yet it is no defence against them. They claim to have a peculiar equity.

Yet their complaint alleges that the defendants severally made the subscriptions, notes, and bills, stated in it, and the issue joined; and the very question therefore to be tried is, as to their validity. It follows that the plaintiffs must prove them to be valid and binding on the defendants, or they do not maintain the issue. If the transactions are void on account of the fraud, then there is legally no subscription, note, or bill.

The plaintiffs allege that there are debts due from the defendants respectively to the insurance company, which she has failed to collect, and they pray that the defendants may be decreed to pay, so that the plaintiffs' judgments may thus be satisfied. In effect, they ask to be substituted in the place of the insurance company, and to be permitted to enforce the payment of debts which she has wrongfully neglected to enforce. This is the whole amount of all the right set forth in the complaint, and of the prayer with which it concludes. Then, if there is no valid debt due from any of the defendants

to the insurance company, there is no matter alleged in the complaint on which the plaintiffs can recover. By being substituted in place of the insurance company, and allowed to assert her rights, the plaintiffs can acquire no greater rights than she had; and where she had none, they acquire none.

    Hyde *v.* Lynde, 4 Com., 387; In matter of Howe, 1 Paige, 125.

    Mech. Bank *v.* N. York and N. Hav. R. R. Co., 3 Kern, 599.

    Roberts *v.* Alb. and W. Stock. R. R. Co., 25 Barb., 662.

If the insurance company had before sued the defendants severally on their notes and bills, and, upon the trial, judgments had been rendered against her on account of the fraud, we submit that such judgments would be a bar to this action; for these plaintiffs come in as privies only, asking the enforcement of her right which she has neglected to enforce. So, if these defendants had filed their several complaints against the insurance company for relief, on account of the fraud, and the court had decreed their notes and bills were void, and should be given up, evidently such decrees would be a bar to this suit. And it is, as a general proposition, true, that what would be good matter of defence against the insurance company would be good also against the plaintiffs.

We admit two exceptions to this general proposition, and can imagine no others. One is, if the insurance company had fraudulently conveyed any of her property to the defendants, the fraud would be a good defence against her, but not against her creditors, in a suit to recover it. The other is, if the defendants had represented, or in any way really held out to the plaintiffs, that their notes and bills were valid, and a fund on the faith of which the plaintiffs might safely insure, they would be estopped from making this defence. But the defendants have done nothing of that kind. The mere fact that the insurance company had these fraudulent notes and bills in her possession did not authorize the plaintiffs to trust her on the defendants' credit. As well might it be claimed, that a note not negotiable, and void, in the hands of the payee, for his fraud in obtaining it, still gave him such a credit with the

world, that his assignee might enforce it as perfectly valid against the defrauded maker.

However, there is no ground whatever for the pretence that the plaintiffs trusted the insurance company on the credit of the defendants' names or paper. There is no evidence tending in any degree to prove the averment of the complaint, that the plaintiffs insured after the defendants gave their notes and bills.

Mr. Justice GRIER delivered the opinion of the court.

The complainants in this case are judgment creditors of the Knox Insurance Company. The numerous other defendants are stockholders of the company, and are severally charged as debtors to it, for the unpaid portion of the stock subscribed by them.

The company is insolvent, or at least is unable to pay its creditors, without calling in the capital subscribed and secured, but not actually paid in cash. This it has failed or refused to do. This bill is filed to compel these stockholders or debtors to the corporation to pay the amount of their debts, in order that the creditors of the company may obtain satisfaction.

The bill was taken *pro confesso* as against the corporation. The other defendants, being corporators, are consequently concluded as to the averments of the bill affecting them as such. As stockholders who have not paid in the whole amount of the stock subscribed and owned by them, they stand in the relation of debtors to the corporation for the several amounts due by each of them. As to them, this bill is in the nature of an attachment, in which they are called on to answer as garnishees of the principal debtor.

Where a number of special partners are incorporated to carry on the business of insurance, the stock subscribed and owned by the several stockholders or partners constitutes the capital or fund publicly pledged to all who deal with them. Insurance companies or corporations, unless they have the privilege of using their capital for banking purposes, seldom require the actual payment of it all in cash. Contracts of

insurance or indemnity, though not literally "gaming contracts," are nevertheless in the nature of wagers against the happening of a certain event. The calculation of chances is greatly in favor of the insurer. In a large number of policies, it is but reasonable to expect that the amount of premiums will exceed that of the losses. The insured are thus made to pay one another, and with common good fortune afford an overplus to make a dividend for the insurers. Hence the Knox Insurance Company, like others of the same description, did not require their stockholders to pay in cash more than ten per cent. of their several shares. They were allowed to retain the remaining ninety per cent. in their own possession, substituting therefor their bonds, or other securities. Thus every stockholder became a borrower from, and debtor to, the capital stock of the company. If in the course of events the chances were favorable, a dividend of twenty per cent. on capital would give a profit of two hundred on the money actually paid out by them. On the contrary, if they were adverse, the capital represented by securities must necessarily be paid in to satisfy the just debts of the company.

The ninety per cent. retained by the stockholders is as much a part of the capital pledged as the cash actually paid in. When that portion of the capital represented by these securities is required to pay the creditors of the company, the stockholders cannot be allowed to refuse the payment of them, unless they show such an equity as would entitle them to a preference over the creditors, if the capital had been paid in cash.

Let us now examine their defence, and see if they have established such an equity.

They do not deny that they paid the ten per cent., gave their securities for the balance, and have received their certificates for their several shares of stock; but they contend that they are not bound to pay these securities, because the agent of the corporation, who took the subscriptions of stock, made certain representations concerning the state of the affairs of the corporation, which were not true; and, as a consequence thereof, they are not bound to pay these securities.

The numerous defendants, with some immaterial variations and qualifications, adopt the answer of their co-defendant, Collum, which we shall give *verbatim* from the record, to show we have not misstated or mistaken the nature of the defence set up.

"And, by way of defence to said suit, said Collum alleges that just before he gave said note, accepted said first bill, Robert N. Carnan, an agent of said insurance company, came to Jeffersonville to procure persons there to give notes and bills for stock in said insurance company; and in order to induce said Collum to give his said note, and accept said first bill for such stock, said Carnan, as such agent, then and there falsely and fraudulently said and represented to said Collum, and in his hearing, that stock in said insurance company to the amount of seventy-five dollars had then been subscribed for at Vincennes, and on the Wabash river, and all of said amount had then been paid or secured as the charter of said insurance company required. Said Collum did not then know, nor then have the means of knowing, to the contrary of said representations, and he fully believed them to be true, and with that belief he gave his said note, and accepted said two bills for stock in said insurance company; and if he had not fully believed said representations, he would not have given said note nor accepted said bills, or either of them. At the time said representations were so made, and said given and said first bill accepted, there had not been more than twenty-five thousand dollars of stock in said insurance company subscribed for and paid and secured, as said charter required, at Vincennes, on the Wabash river, which said Carnan then well knew. Said Carnan also, at and just before said Collum made his said note and accepted his said first bill, represented to him that said insurance company then had $40,000 of funds on hand, mostly in Eastern exchange, which they could not dispose of at Vincennes, and they wished to get stockholders at Jeffersonville, so as to have an officer of said insurance company there, and they would then send those funds there to be sold and used. Said Collum did not then know, and had no means of knowing, to the contrary of said

representation, but he believed it, and it was a strong induce-
ment with him to make his said note and accept his said bills;
yet he is now informed and believes said representation was
grossly false, and that said insurance company did not at that
time have and had not at any time had that sum or anything
like that sum of money on hand, and mostly in Eastern ex-
change, which they could not dispose of at Vincennes."

Carnan, who was examined as a witness, denies the charges
made in this answer, and declares that he was not authorized
by the company to make such representations, and did not
make them.

To establish their defence, several of the defendants them-
selves were called as witnesses, alleging that, as their respon-
sibility was several, and not joint, each one may be called as a
witness for all the rest. Much of the argument of this case
has been expended on the question of the competency of these
witnesses to testify in their own case; but we do not think it
necessary to decide it, as there are other facts in the case
which show clearly that the matter pleaded cannot affect the
relative rights of the parties in the case, assuming it to be
true.

Those who seek to set aside their solemn written contracts,
by proving loose conversations, should be held to make out a
very clear case; and when they charge others with fraud,
founded on such evidence, their own conduct and acts (which
speak louder than words) should be consistent with such a
hypothesis. Assuming the fact that Carnan did make the
representations charged, what was the conduct of these Jeffer-
sonville stockholders, who now seek to repudiate their con-
tracts on the allegation of fraud? After having a full oppor-
tunity to examine for themselves into the affairs of the com-
pany, they alleged no fraud, nor expressed any desire to with-
draw their subscriptions; on the contrary, when fully informed
that the amount of stock subscribed at Vincennes did not
equal that taken at Jeffersonville, and when an offer was made
to increase the Vincennes subscriptions, so as to equal those at
Jeffersonville, the defendants and those who acted with them
*objected*, and insisted that the lower the amount of stock the

higher would be the dividend, and consequently it had better not be increased till after the first dividend of *twenty-five* per cent. had been made.

2. After the defendants had a full opportunity to know the situation of the company, its funds and its property, they organized at Jeffersonville a branch of the corporation, having resident directors at that place. This board met from time to time, through the months of April, May, June, July, and up to 13th August, 1850. While there was a prospect of a dividend of 250 per cent. on the amount of *cash* paid in, their eyes were shut to the deceit supposed to have been practiced on them. In the month of May, a fire at Owensville, Kentucky, was reported, in which the company lost about $50,000. This seemed to injure the prospect of the large dividend; yet even then it was not so clearly perceived that the defendants were defrauded.

The directors at Jeffersonville, who represented their interests, continued to meet till the middle of August, and till a succession of losses made it apparent that the capital of the company would be nearly all required to pay for the losses incurred. When these facts became patent, the directors at Jeffersonville, at their last meeting in August, "*after taking time to consider what was best to be done*," concluded to consider themselves defrauded, and withdraw their capital from the company.

We need not cite authorities to show that this discovery was made too late, and that a court of equity cannot receive such a pretence as a valid defence against the creditors of this corporation.

II. The objection made to the bill for want of proper parties is equally untenable. The creditors of the corporation are seeking satisfaction out of the assets of the company to which the defendants are debtors. If the debts attached are sufficient to pay their demands, the creditors need look no further. They are not bound to settle up all the affairs of this corporation, and the equities between its various stockholders or partners, corporators or debtors. If A is bound to pay his debt to the corporation, in order to satisfy its creditors, he cannot

defend himself by pleading that these complainants might have got their satisfaction out of B quite as well. It is true, if it be necessary to a complete satisfaction to the complainants that the corporation be treated as an insolvent, the court may appoint a receiver, with authority to collect and receive all the debts due to the company, and administer all its assets. In this way, all the other stockholders or debtors may be made to contribute.

For these reasons, we are of opinion that the decree of the Circuit · Court should be reversed, with costs, and that the record be remanded, with instructions to that court to enter a decree for the complainants against the respondents severally, for such amount as it shall appear was due and unpaid by each of them on their shares of the capital stock of the Knox Insurance Company, and to have such other and further proceedings as to justice and right may appertain.