## FINK and others *v.* PATTERSON and others.

*(Circuit Court, E. D. Virginia.   July, 1884.)*

EQUITABLE JURISDICTION AND RELIEF—INSOLVENT PARTNERSHIP—RECEIVER.

    An insolvent firm offers by circular letter to its creditors to pay 50 per cent. of their debts, and agrees in the same circular to make no preferences.   Many creditors accept the offer.   It subsequently continues business at large expense, postpones the execution of this compromise for an indefinite period until all the creditors accept, and pays many of the debts in full, thereby making preferences.   *Held,* equity has jurisdiction on bill filed to appoint a receiver and take possession of the firm assets and administer them for the benefit of the creditors; and this can be done in Virginia by a creditors' bill, without previously obtaining judgments at law.

In Equity.   The facts are stated in the opinion.

*Coke & Pickrell,* for plaintiffs.

*Friend & Davis,* for defendants.

HUGHES, J.   The principal facts of this case, as shown by the papers and proofs now before the court, are as follows:

The defendants are grocers in Petersburgh.   They have been carrying on their business since 1878.   They put no capital in it.   They began with a stock of goods worth about $4,000, and owed for it about $6,000.   Their business has not been profitable.   They have made nothing but their personal expenses.   By the first of June, 1884, they became insolvent, and their business paper went to protest.   Thereupon they consulted legal counsel as to the course best to be pursued.   These advised an assignment in liquidation.   They did not adopt this advice.   They took counsel of mercantile friends in Petersburgh, expressing a wish to go on with their business as the best method of liquidating their affairs.   They determined to go on with it for this purpose.   They accordingly drew up a scheme for compounding with their creditors, framed on the basis of paying 50 per cent.   This was approved and accepted by most of their Petersburgh creditors.   They then proposed this scheme to their creditors in general, embodying it in a circular letter, which was mailed to the non-residents.   The circular was as follows:

"PETERSBURGH, 18th June, 1884.

"*To* ——————.

"DEAR SIR:

"We owe, by bills payable and open accounts,   -     -   $26,552 19
"Our assets are stock in hand, bills receivable, and open
    accounts that we consider good,   -     -     -     14,156 81

"We offer to our creditors fifty cents in the dollar, to be paid as follows: Twenty cents in the dollar, first November, 1884; twenty cents in the dollar on the first March, 1885; and ten cents in the dollar in cash as soon as our banks begin to discount paper, which we believe will be in a very few days. The deferred payments to carry interest at the rate of six per cent. per annum.   We make no preferences, but make the same proposition to all.   Please let us hear from you at as early a date as practicable.

"Yours, truly,                              PATTERSON, MADISON & CO."

Meanwhile, and until the eighth of July, their business went on as before, except that they discharged two clerks, and made purchases of only such goods as were necessary to fill orders, buying both for cash and on credit. They continued to collect and sell, and they paid some of their debts in full.

More than a majority of their non-resident creditors answered accepting their proposition of compromise; a few of them accepting absolutely, but most of them in a form more or less qualified and conditional. The complainants and one or two other creditors refused to accept. In the course of a short time their proposition for compromise, after its acceptance as aforesaid, assumed features not contained and expressed in the circular of June the 18th. Those features were—*First,* that in order to its being obligatory on the defendants all creditors must accept it; *second,* that the creditors accepting must release that portion of their claims not provided to be paid; *third,* that the proposition would be kept open, if necessary, until October, 1884; and, *fourth,* some of their creditors had been and others would be paid in full.

The books of the concern show that the condition of the business is worse than is represented by the circular letter. I infer that the assets will not realize $10,000. It seems, too, as already indicated, that after the proposition of compromise was made, and after its acceptance by many of the creditors was given, the defendants paid off a portion, more or less considerable, of their obligations in full in cash. The statement of their answer on this subject is as follows: "We reserved from the assets a sum sufficient to pay certain confidential debts of the firm which stood upon the highest ground of personal honor and obligation; most, if not all, of which have since matured and been paid out of the fund so reserved and set aside." There is no statement or indication in the answer of what the amount of the fund was which they so reserved and used, or of the amount of these obligations of honor. These must be gathered from the books. The answer further recites that one of defendants' counsel said to one of the complainants in this cause, before the suit was brought, in answer to an inquiry as to what security the creditors who accepted the compromise would have for the payment of the 50 per cent. promised, that if the compromise was made with any of the creditors, and any other creditor should institute proceedings to obstruct the settlement and prevent the payment, he would advise the firm to prefer the parties who accepted for the amount due by the compromise. This conversation was not known to defendants until after the filing of the bill in this cause; and the counsel who made the statement did not know at the time that in their offer of compromise defendants required that all creditors should accept. One of the creditors of the firm, John Pickrell, avers as follows in an affidavit filed: In a conversation he had with Patterson and Madison on the first of July, chiefly with the former, "they positively refused to make an assignment. The affiant assured them that there could be no doubt but that all their creditors would accept it, and release the balance of their claims, and that all that was wanted was a devotion of their assets to the payment of their liabilities. This they refused to do positively. Affiant then pressed them to name some time within which their offer of compromise (which was expressly not to be binding until all their creditors signed) should be accepted or rejected. This, also, they refused to do, stating that none of their creditors could obtain judgment against them until October, and that they would do nothing until that time; and that they would, unless all the creditors should come in before, hold the negotiations open until October. The impression left on the mind of affiant from this conversation is strong that if any of their creditors should eventually force them by suit to make an assignment, such creditor would be left out or postponed to the other creditors."

In a letter to F. E. Patrick, one of their accepting creditors, defendants wrote on the third of July, 1884:

"Your letter accepting our offer of compromise was duly received, and we did not reply, hoping to hear promptly from all of the creditors, when we would at once be able to comply with our proposition. We have the acceptance of the majority, both in number and amount of money due, and think some are waiting for the maturity of our paper that they hold, before writ-

·ing.· We think in the course of two to three weeks, at furthest, we will have the compliance of all.

"Those of our creditors who have signified their agreement to our proposi-·tion may be assured that their interest shall not suffer in any event. Judgment cannot be had against us till late in October, and by that time, by our plan, all will receive thirty per cent. of their debt; and to make an assignment now ,we do not believe they, the creditors, would ever get that much."

The business went on till the eighth instant, when the marshal of this court, under an order issued on the evening before, took possession of the goods in trade, premises, books and papers of the defendants. The order contained a rule upon the defendants to show cause on the tenth instant why a receiver should not be appointed, and why the usual preliminary injunction against interference with the effects of the firm should not be granted.

I am now to pass upon the motion for an injunction and a receiver.

The case is, in its facts, a novel and peculiar one. I do not know any case like it in the reports. Most of the creditors who have accepted the proposition of compromise have but small amounts involved. The proofs seem to show that the complainants in this suit are the largest of the creditors. Their claim is for $2,167; and the debt is acknowledged to be due by the defendants in their answer. This indebtedness was incurred within 90 days before the suspension, and the books show that as much as $20,000 was received by defendants in a short period before and after their failure.

The bill complains that the defendants refuse to make assignment of their effects for the payment of their creditors; that the firm have no credit, and are still going on with a feeble and crippled business, consuming by expenses the fund out of which creditors must be paid; that defendants announce their purpose thus to continue their business until October, if necessary; and that the only redress of creditors against this waste of the fund on which they must exclusively rely for payment, is in a court of equity, by means of the appointment of a receiver and an injunction. They bring their bill, therefore, and pray that through the instrumentality of a receiver the effects of the defendants may be sold, the debts due them collected, and that the fund so arising may be applied *pro rata* to the payment of all creditors.

From and after the acceptance by any creditors of the proposition for compromise made by the defendants on the eighteenth of June, 1884, all the assets of the firm, including property and choses in action, became a trust fund expressly dedicated to the payment, without preferences, of the 50 per cent. of debts promised by the circular letter. Offering no indorsements, tendering no security, insolvent themselves, their proposition could be nothing else than a dedication of their assets to the fulfillment of the terms of the composition. By accepting, the creditors contracted to receive 50 per cent. in full discharge of their claims. What was the consideration given by the defendants for this agreement but the devotion of their assets to the payment of the 50 per cent.?

It is well-established law that partnership assets are, in the eye of

equity, a trust fund for the payment of partnership debts. Being a trust fund, creditors have a right, by proceedings in equity, to subject it to the purposes of the trust. There is a good deal of learning in the books to the effect that creditors at large have not a direct lien upon this fund; but that their lien must be "worked out" through the equity of the individual partners, and availed of by derivative process. However this may be in ordinary cases, the present case is one in which this implied character of a trust fund is made positive by an express dedication of their assets, by the partnership firm, in their proposition for compromise, to the payment of creditors *pro rata*. It is true that this dedication is open to impeachment on grounds about to be stated; but it is nevertheless true that, as to the defendants themselves, it is valid and binding, and they are estopped from objecting to the defects of the dedication.

The law is well settled that an insolvent partnership may convey its whole property for the payment of its debts, giving preferences among creditors if they choose; and, moreover, if the partners convey all their property for this purpose, they have a right to insert a clause requiring a release from the creditors of the portion of their claims not paid. Such a clause will not vitiate the assignment. *Gordon* v. *Cannon*, 18 Grat. 387. In the absence of a bankruptcy law, such a deed is just as unassailable in a federal as in a state court, and would be unimpeachable in this court. The defendants in this case, however, did not make such an assignment. Nor did they do the next best thing to making an assignment; namely, they did not go on with their business, avoiding complications of every sort. Discarding professional advice, they took counsel from the street; and of their own heads, and without the aid of legal counsel, they drew up a proposal for a compromise, without preferences, and presented it to their creditors, a majority of whom, conciliated by the stipulation that it should be without any preferences, promptly accepted its terms; many of them presuming, no doubt, that a deed of assignment would be made, carrying its provisions into effect. But it afterwards transpired that the defendants would not hold themselves bound by their proposal, unless, before some unnamed date, all the creditors should accept; and unless, in accepting, the creditors should release the portion of their claims not provided for in the proposition. Creditors were also, in course of time, informed that negotiations would be held open if necessary until October, 1884. It is now stated that preferences have been given. Creditors have also discovered that, until all have signed the composition, defendants are going on and intend to go on with their business, receiving moneys, selling off stock in trade, incurring new debts, and paying out cash at their own discretion, fearless of the courts, until October.

The question is whether this is a course of proceeding that a court of equity must needs sanction. If defendants had made a deed conveying to a trustee their stock of goods for the benefit of creditors,

and had inserted in the deed a provision that they should remain in possession and continue the business as it was carried on before the deed, until default should be made in paying any of the debts secured, the law of the land declares that such a deed would have been fraudulent and void. *Addington* v. *Etheridge*, 12 Grat. 436. Yet these defendants, after dedicating their property to the payment of their debts, went on to do, without making a deed, precisely what, if they had made one, would have been pronounced fraudulent.

Again, a debtor may require of creditors a release from that part of their claims not provided for in a deed of assignment, if he conveys in the deed all his property; and if in the deed he gives the creditors all the information in regard to his condition which they ought to have in order to determine whether or not to accept the terms of the deed and to release what it does not provide for. Unless a deed requiring such a release does do this, the law pronounces it invalid and void. *Gordon* v. *Cannon*, 18 Grat. 388. The defendants did not make a deed; but, while giving out by their circular letter that they were dedicating all their assets to the purposes of the compromise, they now themselves say in their answer that they withheld a considerable amount of money in cash, and paid off various debts of honor in full. Instead of imparting this information in their circular of June 18th to their creditors, they withheld it from them, stating that they gave no preferences. Here again they did, without executing a deed, what, if they had done it in executing one, would have rendered the deed fraudulent and void. The statement of their condition in the circular letter, instead of imparting true information to the creditors, not only suppressed the fact just alluded to, but was otherwise exceedingly deceptive. Most probably this latter deception was not intentional. Debtors usually victimize themselves more than their creditors in their estimates of their own pecuniary condition. The real fact was that the defendants were too far gone in irretrievable insolvency to have honestly continued their business. Every sale they have since made, every dollar they have since paid out, has been more or less prejudicial to the interests, and has been positively violative of the rights of their creditors. When goods in trade are once dedicated to the payment of creditors; when the character of a positive and express trust is once imparted to assets by the debtor's act, whether by deed or otherwise,—then any dealing thereafter with them by the debtor is improper in itself, and fraudulent in the eye of the law.

Here was the case of a firm hopelessly insolvent,—insolvent beyond their own belief, and beyond the representations they made to creditors in proposing a composition. Here was the case of a firm making a proposition of compromise without preferences, which implied and from which the law presumed that they were offering to dedicate all their effects to its fulfillment, yet withholding large cash means, and paying off in full with this cash a portion of their credit-

ors, after most of the others had accepted their proposition which promised no preferences, and while it was pending for the acceptance of the rest. Here was the case of a firm which, after dedicating and being presumed by law to have dedicated all their effects as a trust fund to the payment of all their debts *pro rata*, yet going on with the business as if the property was still their own, paying off debts in full, and subjecting an exceedingly perishable trust fund to the hazards and losses of a business which had brought them, while in good credit, to hopeless bankruptcy.

On the case thus presented to the court the crucial question is whether equity has any remedy for such a state of things. The complainants in this cause are the largest creditors of the defendants. The proposition of June 18, 1884, is still open to their acceptance. They would be willing to accept if any security were offered that the promise to pay 50 per cent. would be fulfilled. In the absence of such security they would still be willing to accept, if by deed of assignment the assets of the defendants were set apart out of the control of defendants and appropriated to the payment of the claims of creditors. They complain that they are secured in neither of these forms; and they pray for an injunction and the appointment of a receiver as the only means left of intercepting these funds from waste and dissipation, and of securing them for distribution *pro rata* among creditors.

The bill in this case is addressed to the condition of things which has been described. It is not a bill such as a creditor usually files in his own interest for setting aside an assignment on the ground that it was made to hinder, delay, and defraud creditors. In almost all the states of the Union a bill for that purpose can only be brought by a creditor who has obtained a judgment or decree for his claim. In such a case, the grantee in the deed complained of has a lien by force of his deed, and the courts refuse to allow this deed to be assailed except by a creditor whose claim is equally as well authenticated. This creditor is required to have established a lien, and to show that he is without power to make it good, before assailing the deed of his debtor. His bill is "in execution" of his judgment or decree. Even such a creditor is not permitted to set aside the deed except upon proof not only that it is fraudulent, but that the grantee had notice of the fraud at the time of receiving it. If he can show these facts, then the creditor, in the decree setting aside the deed, is paid his full claim out of the property fraudulently converted in preference to other creditors. I fully concur in all the propositions of law announced by counsel for defendants in respect to bills of this character brought by individual creditors, in their individual interest, praying relief for themselves individually. As against such creditors the assignment of a debtor is good, whether giving preferences or not, if made *bona fide*, and if free from provisions from which the law in its policy presumes fraud.

But in the present case the creditor asserts no individual lien, claims no individual preference, and sues for all creditors. It is a creditors' bill, sometimes called an omnibus bill, being a bill *for all*. It is not directed at property alone, or property fraudulently appropriated within the purview of the statute of Elizabeth; but it is directed at all the assets of the defendants, as well that existing in the form of tangible property as that in the form of open accounts, notes due, and choses in action generally, for the ingathering of which a receiver is necessary. Mr. Wait, citing abundant authority, says of such a bill:

"It may be asked in what respects a creditors' bill differs from an ordinary bill in equity prosecuted to cancel a convinous conveyance. The answer is that the creditors' bill is broader and more effectual in its operation and results. The ordinary bill in equity is generally brought to unravel some particular transaction and to annul some particular conveyance. A creditors' bill is, on the other hand, usually in the nature of a bill of discovery, and more extended in its results; not only does it reach property described therein, but by means of this remedy every species of assets and even debts due the debtor, of which the creditor knows nothing, may be reached through the instrumentality of a receiver and applied to the claim." Wait, Fraud. Conv. 103, 104, and note.

In 2 Barb. Ch. Pr. 149, (a work written under the eye and under the correcting hand of Chancellor WALWORTH, and as useful as authoritative,) the author describes a creditors' bill as "a suit brought for the administration of assets, to reach property fraudulently disposed of, etc. The bill in such cases is filed in behalf of the complainant and all others standing in a similar relation, who may come in under such bill, and the decree to be made. It may be filed by simple contract creditors, and does not require a judgment to have been obtained."

It is true that creditors' bills are usually employed to settle up decedent or other estates, and to prevent a multiplicity of suits by creditors, each eager to establish by suit a priority of lien upon the assets out of which he is to be paid. But there is no principle of equity which confines these suits to any one class of cases. As society advances, and its methods of business undergo change, equity will adapt its relief to the changed condition of things. This is an old principle of equity. Indeed, equity jurisprudence originated in the necessity of applying new remedies to evils previously unknown to the law.

The case we are now dealing with is novel and peculiar; but the present proceeding is as old as equity itself. This is not a bill to set aside a deed. It is true that the dedication of assets which has been mentioned is objectionable in the particulars I have heretofore described; and this bill may be considered as one brought under section 2 of chapter 175 of the Code of Virginia to set it aside, that provision of the Code allowing bills of the sort to be brought by creditors who have not obtained judgment or decree, and have not established specific liens. But while in this view of the case I feel perfectly safe

on the score of jurisdiction, I prefer to regard the present bill as a creditors' bill of the kind described by the text writers Mr. Wait and Mr. Barbour.

It was such a bill as this that was filed in the case of *Finney* v. *Bennett*, 27 Grat. 365. The assets there administered were those of an insolvent bank owing several classes of creditors. The case was decided in circuit court by Judge WINGFIELD, who, in answer to objections of jurisdiction similar to those urged in the case at bar, delivered an opinion which was adopted as its own by the supreme court of appeals of Virginia when the case was taken there. He assimilated the suit to a creditors' bill brought against the estate of a decedent insolvent debtor in the hands of his personal representative. If creditors were left to sue individually, each would obtain a preference, to be paid in full according to the dates of their respective judgments, a few getting their whole debt, many getting nothing at all. The object of the bill was to prevent such a scramble and to secure a *pro rata* distribution to all. The court said:

"But it may be objected there is no precedent for such a case. Concede this. Yet it does not follow that when a case arises which comes within the principles of its constitution and ordinary jurisdiction, the court ought not to take cognizance of it because it is a new case and not to be found in the reports. * * * An eminent recent chancellor of England has declared that ' it is the duty of every court of equity to adapt its practice and course of proceedings, as far as possible, to the existing state of society; and to apply its jurisdiction to all new cases which, from the progress daily making in the affairs of men, must certainly arise.' Lord' COTTINGHAM, [*Taylor* v. *Salmon*,] 4 Mylne & C. 141."

The supreme court of appeals of Virginia expressed its entire concurrence in this opinion, and adopted it as its own, adding: "What more suitable case could there be for a creditors' bill, and the application of the rule of equity, that 'equality is equity'? If there be no case directly in point, it is the province of a court of equity to provide suitable and adequate remedy for such a case;" and the court repeated the quotation from Lord COTTINGHAM. It also cited *Ogilvie* v. *Knox Ins. Co.* 22 How. 380, in which the United States supreme court held that a court of equity may, at the suggestion of creditors that a corporation is insolvent, administer its assets by a receiver, and thus collect all subscriptions or debts due the corporation.

We are not, therefore, without precedent for the present suit. This is not merely a creditors' bill praying injunction, receiver, and payment of all creditors *pro rata*, but is, as to complainants, a bill founded upon a particular equity entitling them to a standing in court. The bill would have been the same as many others with which the courts are every day occupied, if the defendants had done by deed what they are doing without deed. If in the case of a deed the court would have interposed to prevent the acts of defendant, how can it be contended that the mere absence of a deed deprives it of jurisdiction and divests complainants of a redress which a court of equity

only can give? It is an old principle that a court of equity will interpose to prevent what it would afterwards undo. Roberts, Fraud. Conv. 520. If defendants, by doing without making a deed what equity would undo if a deed had been made, can thereby deprive equity of jurisdiction, then creditors would be at the mercy of fraudulent debtors, and the courts would be set at defiance. Aside from this view, complainants have special equities in this case. They are the largest creditors of defendants. They have no security that if they accept the proposition of compromise, which they are willing to do, its terms will be complied with. Defendants offer, and I presume can give, no security, either in the persons of indorsers or in any other form, that they will fulfil their part of the compromise. Notwithstanding this inability, they are themselves administering the assets which they have dedicated to their creditors, and in a manner necessarily involving waste, and incompatible with the purposes of the trust. They offer, and I presume can give, no bond for properly administering these trust assets. There is but one mode in which complainants can insure the application of these assets to the purposes of the trust imposed upon them, and that is by the intervention of the court through the instrumentality of a receiver and an injunction. This is what they ask. Is not the court bound to give them the security of a responsible and judicial administration of the trust fund?

It is laid down as a general principle that if a trustee becomes insolvent and compounds with his creditors he may be removed; and this is on the ground that the *cestui que trust* has a right to have the trust administered by responsible trustees. 1 Perry, Trusts, § 279. A man who has a common interest with others in a trust fund or trust estate, is entitled to sue on behalf of himself and others for the protection of the property by injunction, when the property is in the hands of an insolvent. Kerr, Inj., citing *Scott. v. Becher*, 4 Price, 346. When the act complained of would, if done, be irremediable, the court will interfere as a matter of course, and take property out of the hands of irresponsible parties misapplying it. A bill will lie and injunction be granted in the case of a surviving partner who is embarrassed and is misapplying the funds, to restrain him from disposing of the assets. *Hartz v. Schrader*, 8 Ves. 318. In this case the injunction was given but a receiver refused. In the similar case of *Read v. Bowers*, 4 Brown, Ch. 441, an injunction was granted and a receiver appointed. There was no question of the jurisdiction of equity to interfere in either case.

On the whole, I have no doubt of the power of the court to entertain this bill, and to grant the relief for which it prays. I think, also, there is necessity for the intervention of the court in this matter by granting a preliminary injunction, and by appointing a receiver; and I will so decree.