## MORRISON *v.* PRICE, Receiver.

*(Circuit Court, D. Massachusetts.* March 14, 1885.)

NATIONAL BANKS—INDIVIDUAL LIABILITY OF STOCKHOLDERS—VOLUNTARY ASSESSMENT—INCREASE OF CAPITAL.

The Pacific National Bank of Boston was organized in October, 1877, with a capital of $250,000, with the right to increase it to $1,000,000. In November, 1879, its capital was raised to $500,000; September 13, 1881, the directors voted to increase the capital to $1,000,000. On November 18, 1881, the bank suspended. On December 13, 1881, the directors voted that as $38,700 of the increase of capital stock had not been paid in, the capital be fixed at $961,300, and the comptroller of currency was notified to that effect, and he notified the bank, under Rev. St. § 5205, to pay a deficiency on its capital stock by an assessment of 100 per cent. At the annual meeting the assessment was voted, and on March 18, 1882, with consent of the comptroller and the approval of the directors and the examiner, the bank resumed business, and continued until May 20, 1882, when it again suspended and was put in the hands of a receiver. Prior to May 20, 1882, $742,800 of the voluntary assessment had been paid in. Complainant was the owner of 25 shares of stock on September 13, 1881, and after the vote to increase the stock, took 25 shares, for which he paid $2,500, on October 1, 1881, and received a certificate. He voted for the assessment at the annual meeting, and in February, 1882, paid the assessment on the old and new stock, and subsequently sought to enjoin the suit at law against him by the receiver, to enforce his individual liability as a stockholder, under Rev. St. § 5151, on the ground that the increase of capital was illegal and void, and that the voluntary assessment under Rev. St. § 5205, relieved the stockholders of individual liability. *Held,* that he was not entitled to relief, and the bill should be dismissed.

In Equity.

*A. P. Gould* and *B. N. Johnson,* for complainant.

*A. A. Ranney,* for defendant.

COLT, J. This is a suit to restrain the further prosecution of an action at law brought by the defendant, as receiver of the Pacific National Bank, against the complainant, to recover an assessment made under the direction of the comptroller of currency, for the purpose of enforcing the individual liability of the stockholders under section 5151, Rev. St. The Pacific National Bank of Boston was organized in October, 1877, under the national banking law. Its capital was $250,000, with the right of increase to $1,000,000. In November, 1879, the capital was raised to $500,000. On September 13, 1881, the directors voted to increase the capital to $1,000,000. On November 18, 1881, the bank suspended, and Daniel Needham was appointed examiner. He took possession of the bank, and remained in charge until it reopened, March 18, 1882. On December 13, 1881, the directors passed the following vote:

Voted that whereas, it was voted by this board, on the thirteenth day of September last, that the capital of this bank be increased to one million dollars, and that stockholders of this date have the right to take the new stock at par in equal amount to that held by them;

And whereas, the stockholders were duly notified of said vote, and also that subscriptions to the new stock would be payable October 1st;

And whereas, $461,300 of said new stock has been taken and paid in;

And whereas, $38,700 thereof has not been taken and paid in;

Voted that said $38,700 of said stock be and is hereby canceled and deducted from said capital stock of $1,000,000, and that the paid-up capital stock of this association amounts to $961,300.

Voted that the comptroller of the currency be notified that the capital of this association has been increased in the sum of $461,300, and that the whole amount of said increase has been paid in as part of the capital of this association, and that he be requested to issue his certificate of said increase to this association, according to law.

The comptroller having received notice of the increase of the capital stock in the sum of $461,300, and that the whole amount had been paid in, duly certified his approval of such increase on December 16, 1881. On the same day he notified the bank, under section 5205, Rev. St., to pay a deficiency on its capital stock by an assessment of 100 per cent., its entire capital stock having been lost; .and in case the deficiency was not paid, and the bank refused to go into liquidation for three months after the notice was received, then a receiver would be appointed. At the annual meeting of the stockholders of the bank, on January 10, 1882, an assessment of 100 per cent. on the stock was voted. With consent of the comptroller, and the approval of the directors and examiner, the bank, on March 18, 1882, reopened its doors, and continued to do a general banking business until May 20, 1882, when it again suspended, and was thereupon put in charge of the defendant receiver. Prior to May 20, 1882, the sum of $742,800 of the voluntary assessment voted by the stockholders at the January meeting had been paid.

The complainant, on September 13, 1881, was the owner of 25 shares of stock. After the vote of the directors on that day, to increase the capital to $1,000,000, he took new stock to the amount of 25 shares, for which he paid $2,500 on October 1, 1881, and soon after received a certificate. He was present at the stockholders' meeting, January 10, 1882, and voted for the assessment. In February, 1882, he paid the assessment of 100 per cent. on the old and new stock. He now seeks to enjoin the further prosecution of the suit at law, brought against him by the receiver, to enforce his individual liability as a stockholder under the statute, on several grounds. He claims that the increase of the capital stock from $500,000 to $961,300 was illegal and void. By its charter the capital of the bank might be increased to $1,000,000. By section 5142, Rev. St., the whole amount of increase must be first paid in, and the certificate of the comptroller specifying the amount of increase, and his approval thereof, obtained. It appearing that the increase was not in excess of the limit imposed by the charter of the bank, and that it was paid in, and the proper certificate obtained from the comptroller, we see no valid ground for declaring that the increase was *ultra vires* or void. It was within the power of the corporation, and the statutory requirements were complied with.

The case of *Scovill* v. *Thayer*, 105 U. S. 143, does not apply, be-

cause there the corporation attempted to increase its capital beyond the amount prescribed by its charter, and the court held that there was no implied power in a corporation to change the amount of its capital stock as limited by its charter, and that all attempts to do so are void. The court then proceed to affirm the well-settled distinction between an issue of stock which is clearly *ultra vires,* and an issue which is attended with informalities or irregularities as to the mode or manner of issue, but which is within the corporate powers. In the former case only is the stock void. In the latter case it is not. *Upton* v. *Tribilcock,* 91 U. S. 45; *Sanger* v. *Upton,* Id. 56; *Chubb* v. *Upton,* 95 U. S. 665.

Upon the facts here presented the most that can be claimed is that the proceedings in respect to the increase were not regular. The vote of the directors on September 13, 1881, was to increase the capital to $1,000,000, and this notice was sent to each stockholder, and the privilege given, as the charter provides, of subscribing for the new shares in proportion to the amount of old stock owned by the stockholder. Subsequently it was found that $38,700 of the new stock had not been taken, and so the directors, on December 13, 1881, voted to make the increase $461,300, and to this increase the comptroller gave his consent. The point is taken that the vote of December 13th was a vote to reduce the capital stock from $1,000,000 to $961,300, and that to do this under the law required the consent of two-thirds of the stockholders, and the approval of the comptroller. Section 5143, Rev. St. If there had ever been a legal increase of the capital to $1,000,000, there would be some force in this argument; but the capital stock of the bank never was $1,000,000. The first step had been taken to make it that sum, but the amount had not been paid in, and the comptroller had not given his approval. In the absence of these necessary requirements the capital of the bank remained $500,000, until it was increased to $961,300. It cannot be said that the vote of December 13th was for a reduction, because you cannot reduce a capital which never existed. In our opinion, section 5143 has no application to the facts before us, since at no time was the capital of the bank $1,000,000. The vote of September 13th, taken in connection with that of December 13th, followed by the action of the comptroller, established the legal capital of the bank at $961,300.

But it is urged with more force that the stockholders, after the action by the directors on September 13th, subscribed to an increase of $500,000, and that they paid for their new stock and received certificates on the basis of such an increase; in other words, that this was their contract with the corporation, and the only contract by which they are bound. But here, in view of what afterwards took place, comes in the principle of estoppel. It was clearly the duty of each stockholder, as soon as he discovered that the increase was less than what he subscribed for, to repudiate his contract and decline to hold

the new stock. But it surely would be contrary to every equitable principle to hold that a stockholder could retain his new stock without protest after notice, vote upon it at a stockholders' meeting, pay assessments upon it that the bank might reopen, allow the bank in reopening to hold itself out to the world as possessing a capital of $961,300, such capital being a trust fund for the benefit of all creditors, and then, when the bank subsequently passed into the hands of a receiver, to seek for the first time to avoid his liability on the new stock, as against the general creditors of the corporation, on the ground that his contract with the corporation called for an increase of $500,000, while the actual increase was only $461,300. Supposing this new stock had proved profitable, undoubtedly the complainant would have reaped the benefit. Stockholders should not be permitted to deny their liability in case of loss, when they would have shared in the benefits in case of profit. *Sanger* v. *Upton, supra*.

It would seem that the supreme court take the view that it is not necessary to support an action against a stockholder by the corporation or its assignee; that there should have been a subscription for the whole number of shares named in the articles of association. *Chubb* v. *Upton, supra*. But where the doctrine prevails that a stockholder is not liable upon his subscription for stock unless the whole amount is subscribed, the principle is recognized that if, knowing the requisite subscription has not been made, he attends the meetings of the corporation, and co-operates in the votes for spending money and making contracts, he is estopped from setting up this defense. *Cabot & West Springfield Bridge* v. *Chapin*, 6 Cush. 50.

The objection is made that the stockholders were misled as to the condition of the bank when they subscribed for the new stock, and in their subsequent acts in relation thereto. Undoubtedly gross irregularities were committed by some of the officers of the bank before its first suspension in November, 1881. But the subsequent efforts of the directors to revive the bank seem to have been made with an honest intent. If the directors were mistaken as to what proved to be the real value of the assets, so were the examiner and comptroller, as well as the great body of stockholders who attended the meeting of January 10th; and, after considering an exhaustive report showing the condition of the bank, decided to vote an assessment of 100 per cent. on their stock, in the belief that this would make the bank solvent, and enable it to continue business. But whether or not misrepresentations were made by the directors, it cannot affect the liability of the stockholders upon their stock as against general creditors of the corporation. It is well settled that in an action by an assignee to recover unpaid subscription upon stock, the defense of false and fraudulent representations inducing such subscription cannot be set up; especially when the subscriber has not been vigilant in discovering such fraud and in repudiating the contract. And the same principle must be held to apply to a suit by a

receiver to enforce the individual liability of the shareholder, under section 5151. *Chubb* v. *Upton, Upton* v. *Tribilcock,* and *Sanger* v. *Upton, supra; Ogilvie* v. *Knox Ins. Co.* 22 How. 380.

In controversies between stockholders and third parties, it is well to bear in mind that a corporation is but the representative of its stockholders; that it exists mainly for their benefit, and is governed and controlled by them through the officers whom they elect; and when the interest of the public, or of strangers dealing with the corporation, is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally or inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled, so far as it may inequitably affect him. *Sawyer* v. *Hoag,* 17 Wall. 610, 623.

But another ground of defense is taken, and carefully and thoroughly set out in complainant's brief. Upon the principle of equitable performance, or satisfaction, or set-off, it is maintained that the voluntary assessment of 100 per cent. by the stockholders to restore the impaired capital stock, under section 5205, should be held to relieve them of their individual liability as stockholders under section 5151. Hard as it is upon the stockholders to pay another 100 per cent., there is a fatal objection to the application of any of the equitable principles sought to be invoked. The capital stock of a corporation is a trust fund for the benefit of all creditors. It is pledged to those who deal with the corporation for their security. The individual liability of the stockholder, under the statute, is as much a part of this pledge, and a part of the assets of the company for the payment of debts, as the capital stock. *Sanger* v. *Upton, supra.* The statute says the shareholders are liable for "all contracts, debts, and engagements" of the association, to an extent equal to the amount of their stock at its par value. Admitting that the January assessment went to pay certain debts, yet that can in no proper sense be held to be a satisfaction of the lien which all the creditors have upon the capital stock, and the fund derived from the personal liability of the stockholders. There is no equitable principle by which one can fulfill his obligation to a class by the payment in any form of a part of that class to the exclusion of the rest. The double benefits which equity abhors must be to the same recipients, but we cannot conceive how the payment of some creditors in full can be an equitable satisfaction of the legal claims of other creditors who consented to an extension to save the bank, and of new creditors who made deposits after the bank resumed.

The purpose of the voluntary assessment was to restore the impaired capital stock, in order that the bank might reopen. The only alternative was for the bank to pass into the hands of a receiver. The

stockholders decided to levy the assessment. This may have been bad judgment, but general creditors cannot suffer for that reason. If the reorganization of the bank had proved successful, the stockholders might have saved their property. The assessment was voted, the greater part paid in, and the bank reopened. From this time new rights and equities intervened. It is no answer to the rightful claims of new creditors to enforce, through a receiver, the statutory liability of stockholders to say that the assessment went to pay old debts. Suppose the bank had continued business for 10 years, instead of two months, and had paid off all its old liabilities, and incurred new ones; surely the stockholders could not get rid of their individual liability by setting up that, 10 years before, there was paid an assessment of 100 per cent., which went to liquidate certain claims against the bank. If the bank had not reopened, and the assessment had passed into the hands of the receiver, the situation might be different. It might then be claimed with more reason, that, though the assessment was paid for the purpose of restoring the stock, and enabling the bank to continue, it had not been devoted to that purpose, but, having passed into the hands of the receiver, it could be used for the payment of general creditors, and it should therefore be regarded as an equitable performance of the statutory liability. But here the assessment was used for the very purpose for which it was made. It went to restore the impaired stock, and thus enable the bank to reopen. To be sure, it was used to pay some debts, because that was incidental to restoring the stock, but it did not go to pay all debts.

In our opinion, this assessment, made under another section of the statute, and for a different purpose, cannot, on any legal or equitable ground, be held to relieve a stockholder from his individual liability under section 5151. The question whether a bill in equity will lie to restrain a suit of this character was not pressed at the hearing; but, independent of this consideration, our conclusion is that the bill must be dismissed.

Bill dismissed.