DAVIS v. BURNS.    (No. 6610.) †

(Court of Civil Appeals of Texas.    Galveston.
Feb. 23, 1914.    Rehearing Denied
Feb. 11, 1915.)

1. CORPORATIONS ⧉80 — SUBSCRIPTION TO
STOCK—FRAUD.

A subscription to the capital stock of a corporation induced by the fraudulent representations of its agent is not void, but voidable only, and does not become void until it is repudiated by the subscriber.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⧉80.]

2. CORPORATIONS ⧉228 — UNPAID STOCK
SUBSCRIPTION—"TRUST FUND."

Unpaid stock subscriptions constitute a "trust fund" for the benefit of creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 874, 878; Dec. Dig. ⧉228.

For other definitions, see Words and Phrases, First and Second Series, Trust Fund.]

3. CORPORATIONS ⧉80 — STOCK SUBSCRIP-
TION—FRAUD—DISAFFIRMANCE AND RECOV-
ERY.

One who has been induced to subscribe for stock by the fraudulent representations of the agent of a corporation may disaffirm his contract of subscription, and, in a proper proceeding, may recover any money or thing of value paid thereon.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⧉80.]

4. BANKS AND BANKING ⧉80—INSOLVENCY
—DEFRAUDED STOCKHOLDER—CREDITORS.

The right of one induced to subscribe for stock by fraudulent representations of the agent of a corporation to disaffirm his contract of subscription and recover money or value paid thereon is subordinate to the rights of those who, without knowledge of such fraud, and before repudiation by the subscriber, become creditors of the corporation; and the fact that the creditors did not know of the subscription or that the subscriber had not paid the amount thereof does not affect their right, or the right of the receiver to recover as against the subscriber.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. ⧉80.]

5. BANKS AND BANKING ⧉39 — SUBSCRIP-
TION TO STOCK—PAYMENT—CONSTITUTIONAL
PROVISIONS—"ON OR BEFORE."

A subscription contract to stock of a banking company to pay $25 in cash and the balance on or about a certain date, as evidenced by notes given therewith, with the right to renew the notes on the basis covered by the term "on or before," the certificate of stock to be issued on the day before the notes fell due, and being thereby pledged as collateral for payment of the notes, construing the phrase "on or before" as giving the subscriber the privilege of paying the notes at any time before maturity, with interest only to the day of payment, was not a contract of the corporation to deliver the stock upon a mere promise to pay for it, but to deliver it only when payment was actually made in money; and hence did not violate Const. art. 12, § 6, providing that no corporation shall issue stock except for money paid or property actually received.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 44–48; Dec. Dig. ⧉39.]

6. BANKS AND BANKING ⧉37—INCREASE OF
CAPITAL STOCK—RIGHTS OF SUBSCRIBERS
AND CREDITORS—STATUTES.

A banking corporation's charter by the special act of May 23, 1871 (Sp. Acts 12th Leg. c. 264), by the name therein stated, with a capital stock fixed at $200,000, with provision that it might be increased at the option of the association to $500,000, became a contract between the state, the association, and the stockholders, and so long as it existed the association had the right to increase its capital stock without accepting the provisions of the general laws regulating corporations, or complying with Rev. St. 1911, art. 1145, providing the manner in which a corporation incorporated under the general laws may increase its capital stock; and, under Sayles' Ann. Civ. St. 1897, art. 664, permitting any corporation existing under any special law to accept any or all the provisions of the title, the association might accept the provision relating only to the amendment of its charter, and, after amendment of its corporate name, had the right, under its charter, to increase its capital stock from $200,000 to $500,000; and, before repudiation, a subscription to its increased stock could be enforced after its insolvency for the benefit of its creditors.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 42; Dec. Dig. ⧉37.]

Appeal from District Court, De Witt County; John M. Green, Judge.

Action by John W. Burns against T. H. Davis, receiver of the Union Trust Company, with cross-action by the receiver. Judgment for plaintiff, and the receiver appeals. Reversed, and judgment rendered for the receiver.

J. B. Robertson, of Austin, for appellant. W. F. Harris, Davidson & Bailey, and Crain & Hartman, all of Cuero, for appellee.

McMEANS, J.    This action was instituted in the district court of De Witt county on April 8, 1910, by John W. Burns against the Union Trust Company, a corporation, and T. H. Davis, its receiver, for the purpose of having canceled a certain subscription for ten shares of the second series of the capital stock of said Union Trust Company, and for the cancellation and return to him of two certain promissory notes for $900 and $250, respectively, executed by plaintiff, and payable to the said Union Trust Company, bearing date September 4, 1909, and payable January 1, 1910, with interest from maturity. It was alleged that plaintiff had been induced to subscribe for said shares of the second series of said stock and to execute the notes aforesaid by reason of the false and fraudulent representation of the agent of said trust company, acting for it in the matter of procuring such subscription, with regard to the financial condition of said trust company and its business affairs generally; that, relying upon these representations and believing them to be true, plaintiff subscribed for the stock and executed the notes aforesaid. The specific representations so made are set out in the petition, and the fact that they were severally false and fraudulently made for the pur-

pose of inducing plaintiff to subscribe for the stock and .execute the notes specifically charged. It is further alleged that before said notes became due—to wit, in November, 1909—plaintiff discovered the fraud that had been practiced upon him; that he could not in the exercise of reasonable diligence have made this discovery sooner; and that as soon as he discovered the fraud he at once repudiated the transaction and demanded the cancellation of his subscription and a return of his notes, and that he had never exercised or sought to exercise any rights as a stockholder in said corporation, or in any way whatever recognized the validity of said subscription. Defendant answered, denying generally the allegations of the petition, and, specially answering, further alleged, that after plaintiff's subscription and the execution of his notes many persons who had no knowledge of the alleged fraud in procuring the same, and who relied upon the capital stock of the said company and plaintiff's subscription thereto as securing their deposits, deposited money in said Union Trust Company; that there is now due to said depositors sums largely in excess of the amount of plaintiff's notes; and that the said trust company is now, and was on January 10, 1910, insolvent, and plaintiff cannot now, as against the receiver, Davis, lawfully demand a cancellation of said subscription of said stock and notes on account of the fraud alleged. Defendant, Davis, then by way of cross-action alleged the insolvency of the corporation, his appointment and qualification as receiver, the nonpayment of said notes, and prayed for judgment against plaintiff for the amount, principal, interest, and attorney's fees due thereon. By supplemental petition plaintiff alleged that he did not discover the falsity of the representations made to procure the execution of said subscription and notes until November, 1909; that he immediately thereupon repudiated the same, and demanded the cancellation of said subscription and notes. It was further alleged that the said subscription to the stock of the corporation was paid only by the execution of said notes, and that the same were void under the provisions of the Constitution; that he was never advised that this subscription was accepted by the company; that no certificate of stock was ever issued to him; and that he never in any way participated in the proceedings of said corporation as a stockholder, and no rights or obligations as a stockholder in said corporation had ever accrued to him or to any creditor of said corporation against him. The pleadings are voluminous. The foregoing statement will serve to explain the issues. The case was tried without a jury upon an agreed statement of facts. · In its conclusions of law the court held, no payment having been made in money, property, or labor for said stock, the said contract and notes were void and unenforceable under the provisions of section 6, art. 12, of the Constitution, that "no corporation shall issue stock or bonds, except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." Judgment was rendered canceling the notes, and denying the defendant, the receiver of the Union Trust Company, recovery on the notes. From this judgment, his motion for a new trial having been refused, the receiver presents this appeal.

The agreed statement of facts is voluminous. We will only undertake to give in a brief summary the portions thereof which we conceive to be material to the questions presented by the appeal:

On May 23, 1871, by special act of the Legislature of the state of Texas (Sp. Acts 12th Leg. c. 264), the Banking Insurance & Mutual Aid Association of Texas was created a corporation under that name. Its corporate powers were extensive, including the power to do a general banking business. The capital stock was fixed at $200,000 in shares of $100 each, "to be increased, at the option of the association, to $500,000." The original incorporators sold their stock, and their successors acquired their stock and rights in said corporation. On May 18, 1904, the corporation accepted the benefits of title 21 of the General Laws of Texas, "in so far as the same permitted amendments to its charter," and afterwards amended its charter, changing its name to the Itasca Valley State Bank, and afterwards again by amendment changed its name to the Union Trust Company and its place of business to the city of San Antonio, Bexar county, and commenced doing a general banking business in the year 1908 at that place, and continued to do such business at San Antonio and at branches provided for in the charter until January 10, 1910, when its business and affairs were placed in the hands of T. H. Davis, as receiver, who duly qualified as such.

On July 13, 1909, a resolution was passed at the annual stockholders' meeting providing that the capital stock was thereby increased from $200,000 to $500,000. On September 4, 1909, John W. Burns executed his written subscription to the capital stock, which instrument is as follows:

"I hereby subscribe for ten shares of the second series of the capital stock of the Union Trust Company, of San Antonio, Tex., and agree to pay for same $115 per share, payable $25 per share in cash, and the balance on or before January 1, 1910, as evidenced by my promissory notes bearing interest from maturity given by me herewith, with the privilege to renew notes on basis covered by term 'on or before.'

"It is understood that in case of over subscription the directors reserve the right to prorate the stock. The certificates of stock shall be issued on the day before the day that said promissory notes fall due, and are hereby pledged as collateral security for the payment of such notes, according to the terms of the by-laws of the Union Trust Company.

"Witness my hand at Cuero, Tex., on this the 4th day of September, 1909.

"[Signed]  John W. Burns."

At the same time said Burns executed his two promissory notes for $250 and $900, respectively, payable to the order of the Union Trust Company at its office in San Antonio, with interest after maturity, and providing for payment of attorney's fees in the usual terms. These notes were given in payment of the ten shares of stock subscribed for, and were the only payments made thereon. The notes and written subscription were delivered to and accepted by the Union Trust Company, and Burns' name was entered on the books as a stockholder. The subscription and notes passed into the hands of the receiver on his appointment and qualification as receiver, and have never been paid. The agent of the Union Trust Company, in order to induce plaintiff Burns to subscribe for said stock, made the representations charged in the petition. Burns believed such representations to be true, and, in reliance thereon, was induced to make said subscriptions and sign the notes. It is sufficient to state here that certain of such representations relied upon by Burns were shown to be false. The agreed statement established the fraud substantially as charged. Subsequent to September 4, 1909, and prior to November 1, 1909 (the latter being the date when it was alleged plaintiff, Burns, made the discovery of the fraud, and repudiated the transaction) many persons who had not theretofore been depositors or creditors of said trust company, and who had no acquaintance with the plaintiff, Burns, and no knowledge of any representations made to him to induce him to subscribe for the stock, or of any facts to void his liability, and no actual knowledge of his subscription or notes, deposited in the head office and various branches of the Union Trust Company in the aggregate $19,091, of which there is still due a sum largely in excess of the amount of plaintiff's notes. On November 1, 1909, plaintiff first discovered the falsity of the representations made to him by the agent of the trust company aforesaid, when he at once repudiated the transaction, told the officers of the company of the fraud, and demanded the cancellation of the subscription and the delivery to him of his notes. Plaintiff was diligent in his efforts to have the contract canceled, and to recover his notes, being met by false and evasive promises and representations of the officers of the company, until the appointment of the receiver, on January 10, 1910, whereupon, on April 10, 1910, this suit was filed. On November 1, 1909, the Union Trust Company was insolvent, and has so continued. Plaintiff paid no cash or other thing of value on said stock, only executing the notes aforesaid, and no certificate of stock was ever issued to him, nor did he ever participate in any proceeding of the corporation as stockholder. These we take it to be are all of the facts of any materiality embraced in the agreed statement of facts.

The several assignments of error and the propositions thereunder present in different ways the general proposition contended for by appellant, that the court erred in holding the notes and subscription void, and in refusing to render judgment for the receiver for the amount due on the notes.

It is not contended by appellant that the fraudulent representations made by the agent of the corporation, as a means of procuring the subscription and notes, would not be a complete defense to a proceeding on the part of the corporation to collect the notes, or enforce compliance with the subscription, but the case for appellant rests upon the proposition that such fraud affords no defense to this action on the part of the receiver, representing the creditors as well as stockholders of the corporation, to collect the notes. He contends in this connection that when, subsequently to plaintiff's subscription to the capital stock of the corporation, and the execution of the notes in payment therefor, and prior to his attempted repudiation thereof, other persons, having no knowledge of any representations having been made to induce him to subscribe, or of any fraud perpetrated on him, deposited money with the corporation, which was insolvent at the time of such repudiation, and has remained so, and a receiver is appointed to wind up the business of such corporation, and there is still due to such depositors balances in an aggregate amount greater than the liability on such subscription and notes, the subscriber is estopped to rescind his subscription for fraud, and his rights are subordinate to those of subsequent creditors.

[1] It appears to be well settled that a subscription to the capital stock of a corporation, induced by the fraudulent representations of an agent of the corporation, is not void, but voidable only, and does not become void until it is repudiated by the subscriber. This is the rule stated in 2 Morawetz on Corporations, § 839, followed by the Austin Court of Civil Appeals in Burleson v. Davis, Receiver, 141 S. W. 561, in which a writ of error was refused by the Supreme Court.

[2] It is equally well settled that unpaid stock subscriptions constitute a trust fund for the benefit of creditors. Burleson v. Davis, supra, and authorities cited.

[3, 4] It appears to be the undoubted right of a person who has been induced to subscribe for stock by the fraudulent representations of the agent of a corporation to disaffirm his contract of subscription, and, if he has paid any money or thing of value thereon, he is entitled to recover the same in a proper proceeding. But this right is subordinate to the rights of those who, without knowledge of such fraud, and before repudiation by the subscriber of the stock subscription, become creditors of the corporation. Thus in Burleson v. Davis, supra, it is said:

"In such case the subscriber to the capital stock of a corporation by his own act has in-

duced the subsequent creditors of such corporation to believe that the capital stock subscribed by him has been or will be paid in, and will remain a trust fund, to which subsequent creditors may look for security. The stockholder plaintiffs herein subscribed to the stock of the Union Trust Company with the view of making a profit on their investment. By such act on their part they invited the depositors to deposit their money with said trust company, and thereby represented that their subscription to the capital stock was bona fide, and would remain in the vaults of said company to meet any demands that might be made by the depositors. They now by their acts say to the depositors: 'True, we made such representations and pledges to you, but we now seek to repudiate the pledges so made by us, because we were induced to do so, by fraudulent misrepresentations made to us.' By whom? Not by the subsequent creditors; and therefore the subsequent creditors should not be made to suffer by reason of such fraud. Where a party has trusted and been deceived, he ought to bear the loss occasioned by his own credulity, rather than that the same should be borne by another who was not a party to such transaction."

On this subject Morawetz, in his excellent work on Corporations (volume 2, § 839), says:

"Creditors who, in good faith, trust the corporation upon the faith of this security, stand in the position of innocent purchasers for value, to the extent of their equitable lien; and it would be most unjust to permit a shareholder to disaffirm his contract, and refuse to pay his share of the capital, after it has thus been pledged, with his knowledge and consent, to innocent third parties. Moreover, it should be borne in mind that the shareholders of a corporation are the real parties in interest for whom the corporate obligations are incurred. Creditors of a corporation have equitable rights against the shareholders directly, and these rights do not depend upon the agreements existing among the shareholders themselves, or their dealings with the common agents. It has accordingly been settled that, if a corporation is insolvent, a shareholder whose contract of subscription was obtained by the fraud of the company's agents cannot diminish the security of bona fide creditors by rescinding his contract to contribute the amount of capital subscribed by him."

In 1 Thompson on Corporations, § 713, the rule is thus stated:

"The general principles of the law of void and voidable contracts apply to such subscriptions; that is, a subscription induced by fraud is not void per se, but only voidable at the election of the subscriber; 'for, although deceived and misled, he has the right to abide by the contract.' This rule is said to mean nothing more than that the person defrauded into making the subscription has the right to demand a rescission and cancellation, *and that during the interval between the making of the subscription and the time when he claims the right of rescission such subscription is valid. It follows, therefore, that the rescission takes effect from the time when the demand is made, or from the time when the legal proceedings to obtain such rescission are commenced, and does not refer by relation to the time when the contract was made. But it is not meant by this that such subscription subsists until it has been rescinded by a court of competent jurisdiction; it only means that it subsists as such until it is repudiated by some distinct act of the subscriber. As said by the Virginia court: 'A contract procured by fraud is not void, but voidable only, at the option of the party defrauded. It is binding upon him until rescinded, and if, before he exercises the option to rescind, innocent third parties have, in reliance on the fraudulent contract, acquired rights which would be prejudiced by its rescission, they may generally have it enforced for their benefit, although the party by whose fraud it was procured could not do so.'"

In Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1015, Pridham, as receiver for an insolvent corporation, brought suit against the various stockholders thereof to recover the unpaid portion of their subscriptions to the capital stock of the corporation. Some of the stockholders pleaded that their signatures to the subscriptions were procured by false and fraudulent representations made by the corporation through its officers and agents as to its indebtedness and the amount of its deposits, and that, at the time they signed said contracts, and in order to induce them to do so, the corporation represented to them that said company was amply able to, and would, furnish one-half of the money necessary to purchase, locate, and equip the houses at Ft. Worth, and that the signers of said contract would only have to furnish the other one-half of said sum; that said statement was false and untrue, and was made to deceive the said defendants; and that by reason of said statements the defendants were induced to sign their names to said contract, and would not have done so except for the fact that they believed and relied upon said statements as true, and did not know that they were false and untrue. The trial court sustained a demurrer to this plea. Upon appeal this action of the trial court was assigned as error, and Judge Williams, speaking for the court, said:

"There was no error in sustaining exceptions to the pleas setting up that the subscriptions of the Ft. Worth defendants were obtained by fraudulent representations. Enough facts were not stated to make a good defense against the corporation itself. But, admitting that the facts, if timely set up, would have availed against the company, they could not be of any avail in this proceeding as * * * against creditors. Cook, Stocks, §§ 154–210, note 141; Ogilvie v. Insurance Co., 22 How. 380 [16 L. Ed. 349]."

See, also, Scott v. Deweese, 181 U. S. 202, 21 Sup. Ct. 585, 45 L. Ed. 822; Marion Trust Co. v. Blish (Ind. App.) 79 N. E. 415; Cook on Stock & Stockholders, § 160; Dettra v. Kestner, 147 Pa. 578, 23 Atl. 889; Zang v. Adams, 23 Colo. 408, 48 Pac. 509, 58 Am. St. Rep. 249.

It is shown by our fact findings that appellee subscribed for the stock and executed his notes in payment therefor on September 4, 1909; that he did not repudiate his subscription and demand a return of his notes until November 1, 1909, at which time the corporation was insolvent; that between the dates of the subscription and the attempted repudiation many persons who had not theretofore been depositors and creditors of the corporation, and who had no acquaintance with appellee, Burns, and no knowledge of any representations made to him to induce

him to subscribe for the stock, or of any facts to avoid his liability, and no actual knowledge of his subscription and notes, deposited in the head office and the various branches of the corporation sums of money, of which there is still due a sum largely in excess of the amount of appellee's notes. Does the fact that these persons did not know at the time they became creditors of the corporation that appellee was a subscriber, or that he had not paid the amount of his subscription, affect their right or the right of the receiver to recover? This question is sufficiently answered in Hospes v. Northwestern Mfg. Co., 48 Minn. 198, 50 N. W. 1121, 15 L. R. A. 474, 31 Am. St. Rep. 637, from which we quote:

"Inasmuch as the capital of a corporation is the basis of its credit, its financial standing and reputation in the community has its source in, and is founded upon, the amount of its professed and supposed capital, and every one who deals with it does so upon the faith of that standing and reputation, although, as a matter of fact, he may have no personal knowledge of the amount of its professed capital, and in a majority of cases knows nothing about the shares of stock held by any particular stockholder, or, if so, what was paid for them. Hence, in a suit by such creditor against the holders of 'bonus' stock, he could not truthfully allege, and could not affirmatively prove, that he believed that the defendants' stock had been paid for, and that he gave the corporation credit on the faith of it, although, as a matter of fact, he actually gave the credit on the faith of the financial standing of the corporation, which was based upon its apparent and professed amount of capital. The misrepresentation as to the amount of capital would operate as a fraud on such a creditor as fully and effectually as if he had personal knowledge of the existence of the defendants' stock, and believed it to have been paid for when he gave the credit. For this reason, among others, we think that all that is necessary to allege or prove in that regard is that the plaintiff is a subsequent creditor, and that, if the fact was that he dealt with the corporation with knowledge of the arrangement by which the bonus stock was issued, this is a matter of defense."

In this connection we again quote from Burleson v. Davis, supra:

"It is well established * * * that the rights of the stockholders who have been induced to purchase stock by the fraudulent representations of the corporation or its agents are subordinated to the rights of those who, without any knowledge of such fraud, have subsequently become creditors of the corporation."

Upon the facts of this case and from the law, as it appears to be from the authorities quoted, we hold that appellee was not entitled to a rescission of his contract of subscription and the cancellation of his note given for the price of same, but, on the contrary, the appellant, receiver, representing the stockholders and the creditors, was entitled to a judgment against him on his cross-action for the amount of the notes, which was the contract price of the stock, and interest and attorney's fees as in said notes provided, and the court should have rendered judgment accordingly.

[5] But appellee contends that the judgment should be upheld on the ground upon which the case was decided in his favor by the trial court; viz., that no payment having been made in money, property, or labor for said stock, the contract and notes were void and unenforceable under the provisions of section 6, art. 12, of the Constitution, which provides that:

"No corporation shall issue stock or bonds, except for money paid, labor done, or property actually received; and all fictitious increase of stock or indebtedness shall be void."

It will be noted that by the terms of the contract of subscription appellee agreed to pay $25 in cash, and the balance on or before January 1, 1910, as evidenced by his promissory notes given therewith, "with the privilege to renew the notes on the basis covered by the term 'on or before'"; and, further, that "the certificates of stock shall be issued on the day before the day that said promissory notes fall due, and are hereby pledged as collateral security for the payment of such notes according to the terms of the by-laws of the Union Trust Company." Just what is meant by the expression "with privilege to renew notes on basis covered by the terms 'on or before'" is not clear. We understand that phrase to mean only that the maker has the privilege of paying the notes at any time before maturity, with interest only to the date of payment, and we know of no rule of law or of any decision which construes such language as conferring upon the maker the privilege of renewing at maturity. But, granting that the privilege to renew was given, we can see that it makes no difference to a case where such a right was denied. It is evident that it was not the intention of the corporation to deliver the certificates of stock until payment therefor was actually made in money (and no certificate of stock was ever issued to him); hence the agreement to issue on the day before the notes fell due, with a privilege of a renewal of the notes, was not tantamount to an agreement to sell and deliver the stock upon a mere promise to pay for it. Had the notes not been executed, and no reference to the execution of notes had been made in the contract of subscription, could it be successfully contended that the contract was unenforceable because in conflict with section 6, art. 12, of the Constitution? We think not. We think that the notes were of no greater dignity than the contract of subscription would have been had the notes not been given, in so far as it affects the liability of appellee to subsequent creditors, for, having been executed at the same time and as a part of the same transaction, the notes and subscription contract evidenced one contract only, and that was to take and pay for the stock. That such a transaction does not contravene section 6, art. 12, of the Constitution we think clear, and are sustained in this conclusion, we think, by the following authorities: Street Ry. Co. v. Adams, 87 Tex. 125, 26 S. W. 1040; McCarthy v. Texas

Loan & Guaranty Co., 142 S. W. 96; Houston Fire & Marine Insurance Co. v. Swain, 114 S. W. 154.

[6] Appellee advances the following proposition:

"The creditor's right to rely upon the subscription is based upon a legal right on the part of the corporation to receive the credit, the relation of principal and agent having been established between the subscriber and the corporation, or upon facts of estoppel chargeable to the subscriber. If there be no legal right on the part of the corporation to receive the credit, no agency or no estoppel, creditors would have no right to rely on the subscription."

Appellee, in answer to appellant's cross-action, denied that any creditor had a right to extend credit to the corporation on the faith of his subscription, and he contends that, if the creditors extended credit to the corporation before it was authorized to receive credit on the faith of appellee's notes, they had no right to do so, and that, as to the credit so extended, the appellee was an outsider, and, as such, the creditors acquired no rights against him. Appellee does not question the legality of the charter of the corporation, or its right to do business as a corporation with a capital stock of $200,000, but contends, as we understand, that, the corporation not having complied with the statute authorizing it to do business with the increased capital stock, the creditors had no right to extend credit upon the faith of the stock intended to make such increase, and that therefore the burden would be upon the creditors, or, in this case, upon the receiver, to show that the statute providing the manner in which such increase may be made was complied with.

The Acts of 1907, p. 309, brought forward in the Revised Statutes of 1911 as article 1145, provides the manner in which a corporation incorporated under the general laws may increase its capital stock; and it may be that, before the creditors or receiver of a corporation chartered under the general law would be entitled to require a subscriber for stock to pay the amount of his stock subscription, the statute in question would have to be complied with. But, in our opinion, the Union Trust Company occupied a different position in this regard from a corporation chartered under general laws. The original charter, under which it was acting in 1909, was granted by a special act of the Legislature, and, while its capital stock was fixed by the act at $200,000, it was expressly provided that the capital stock could be increased, at the option of the association, to $500,000. This charter, when it was afterwards accepted and acted upon by the original association, became a contract between the state, the corporation, and the stockholders, and as long as it existed as a corporation the association had a right, in pursuance of the express powers granted, to make the increase of its stock at its option without accepting the provisions of the general

173 S.W.—31

laws regulating the formation and chartering of corporations, and without complying with the provisions of article 1145, regulating the manner of making such increase by corporations chartered under general laws. As before shown, the original corporation was chartered by special act on May 23, 1871, by the name of the Banking Insurance & Mutual Aid Association of Texas. On May 18, 1904, the corporation accepted the benefits of title 21 of the General Laws of Texas, in so far only as the same permitted amendments to its charter, and afterwards amended its charter by changing its name to the Itasca Valley State Bank, and afterwards, again by amendment, changed its name to the Union Trust Company. Article 664, Sayles' Civil Statutes, provides:

"Any corporation heretofore organized and now in existence under any * * * special law of the republic or state of Texas, may, by a vote of its board of directors, accept any or all of the provisions of this title, and have and exercise all of the rights, * * * and privileges conferred by this title, by filing a copy of their acceptance with the secretary of state; whereupon, that portion of its charter inconsistent with * * * the portion accepted, shall cease to be applicable to such corporation; and it shall have the exclusive right to carry out the objects of said corporation, as described in its act of incorporation, * * * within the limits or boundaries described in said act of incorporation * * * without any limitation as to time, and shall possess all the privileges and franchises conferred by its act of incorporation * * * not abandoned in the * * * acceptance of any or all the provisions of this title."

The statute gave to the corporation the right to accept any provision of title 21 without accepting the whole; and under it the corporation had the right to accept the provision relating only to an amendment of its charter, and, as the amendment only consisted of a change in the corporate name, it still had the right to carry out the objects of its original incorporation as described in the special act granting the charter, and still possessed all the privileges and franchises conferred thereby. One of these privileges was the right to increase the capital stock from $200,000 to $500,000, at the option of the corporation, and this privilege was not lost or abandoned by accepting the provision of title 21, relating to the manner of amendment of charters, and the amendment in conformity therewith changing the corporate name only. It follows from this that the corporation had the right to make the increase at will; and appellee, having subscribed for the stock after the increase was made, stands in the same position as if he had subscribed to the stock of any other corporation after it had been chartered, and his subscription can be enforced for the benefit of creditors who became such after he subscribed and before he repudiated his subscription just as it could if he had been a subscriber to the stock of any other corporation and failed to pay the amount of his subscription.

We have examined all of appellee's counter

propositions and independent propositions, and have given grave consideration to the able argument of his counsel, but our conclusion upon the whole case as presented in the record and the briefs of the parties is that the judgment for appellee was not warranted, and that upon the law and the undisputed facts judgment should have been rendered for appellant. The judgment of the court below is therefore reversed, and judgment here rendered for appellant.

Reversed and rendered.

PLEASANTS, C. J., did not sit in this case.